IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

MICHAEL J. BUCZ                                                            PLAINTIFF

             v.                        Civil No. 13-3012

CAROLYN W. COLVIN,[1] Commissioner
Social Security Administration                                    DEFENDANT

MEMORANDUM OPINION

Plaintiff, Michael J. Bucz, brings this action under 42 U.S.C. § 405(g), seeking judicial review

of a decision of the Commissioner of Social Security Administration (Commissioner) denying his/her

claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the

Act"), 42 U.S.C. §§ 423(d)(1)(A). In this judicial review, the court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C.

§ 405(g).

I.       **Procedural Background**

Plaintiff applied for DIB on September 17, 2010. (Tr. 10.) Plaintiff alleged an onset date of

October 1, 2009 due to extreme fatigue, muscle aches, depression, weakness, lethargy, nausea,  and

Chronic Lyme Disease. (Tr. 169.) Plaintiff's applications were denied initially and on reconsideration.

Plaintiff requested an administrative hearing, which was held on November 15, 2011. (Tr. 24.)  Plaintiff

and his wife, Cheryl Bucz, were present to testify and represented by counsel. The ALJ also heard

testimony from Vocational Expert ("VE") John Massey.

At the time of the administrative hearing, Plaintiff was 48 years old, and possessed a  high school

education and on-the-job training as a mechanic. (Tr. 27-28.) The Plaintiff had past relevant work

---

[1]Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013. Pursuant to Rule
25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner
Michael J. Astrue as the defendant in this suit.

experience ("PRW") of auto mechanic, marine mechanic, boat production assembler/outfitter, brake mechanic, starter and alternator rebuilder, and a construction worker. (Tr. 17-18.)

On February 17, 2012, the ALJ concluded that Plaintiff suffered from the following severe impairments: myalgias and associated fatigue with a history of Lyme disease, hypertension, and anxiety order (NOS). (Tr. 12.) The ALJ found that Plaintiff maintained the residual functional capacity to perform light exertional level, semiskilled, work, with additional limitations. (Tr. 18.) Exactly what those additional limitations are is not stated in the opinion. An examination of the hearing transcript reveals the following additional limitations were given to the VE: "Interpersonal contact is routine but superficial; complexity of tasks is learned by experience with several variables, judgment within limits." (Tr. 65.) With the assistance of the VE, the ALJ determined that the Plaintiff could perform such representative occupations as production worker/assembler, advertising material distributor, assembly worker such as lens inserter, escort vehicle driver, machine operator such as zipper trimmer machine operator. (Tr. 19-20.)

Plaintiff requested a review by the Appeals Council on March 2, 2012. (Tr. 6.) The Appeals Council declined to review the ALJ's decision on November 30, 2012. (Tr. 1.)

## II.     Applicable Law

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id.* "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If the court finds it possible "to draw two inconsistent

2

positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.  *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  *See* 20 C.F.R. § § 404.1520(a)- (f)(2003).  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

## III.   Discussion

Plaintiff raises three issues on appeal: 1) the ALJ did not perform a proper *Polaski* credibility analysis ; 2) the ALJ's determination of Overall RFC was made without the benefit of a Physical RFC from a treating or consulting physician; and  3) the ALJ erred by failing to follow SSR 82-63. Because this Court

3

agrees that there is no Physical RFC from any medical source in the record and that the ALJ did not perform a proper *Polaski* analysis, SSR 82-63 will not be addressed.

**A. Improper Credibility Analysis**

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir.2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2002)). The ALJ must consider several factors when evaluating a claimant's subjective complaints of pain, including claimant's prior work record, observations by third parties, and observations of treating and examining physicians relating to 1) the claimant's daily activities; 2) the duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Casey*, 503 F.3d 687, 695 (8th Cir.2007) (citing *Polaski v. Heckler*, 729 F.2d 1320, 1322 (8th Cir.1984). In discrediting a claimant's subjective complaints, an ALJ is required to consider all available evidence on the record as a whole and is required to make an express credibility determination.  *Lowe v. Apfel,* 226 F.3d 969, 971 (8th Cir. 2000). However, the ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.2004). An ALJ's decision  to discredit a claimant's credibility is entitled to deference when the ALJ provides "good reason for doing so." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001.)

The ALJ erred in his *Polaski* analysis on five points.

First, a  proper *Polaski* analysis requires the ALJ to conduct an express examination of the dosage, effectiveness, and side effects of all medication. *Polaski*, 739 F. 2d at 1322. Failure to include medication side effects in the hypothetical to the VE, "at a minimum," requires the case to be remanded. *Mitchell v. Sullivan*, 925 F.2d 247, 250 (8th Cir. 1991).

4

In this case, Plaintiff was definitively diagnosed with Lyme Disease in April 16, 2010.[2] (Tr. 260.) A positive lab test result for the Lyme spirochete *Borelia burdorferi* confirmed clinical symptoms. (Tr. 260.) At that time he was prescribed four months of Doxycycline, with one month given to him for free and three refills.[3] (Tr. 260-61.) He was also prescribed Benicar[4] and Testim gel.[5] (Tr. 261.) On October 6, 2010, he presented with worsening fatigue, insomnia, and myalgias. Lab tests were repeated, with another positive result for Lyme Disease. He was prescribed sixty days of Cipro[6] and one Medrol dose

---

[2]A later doctor's notations and some of the Plaintiff's documentation states that he has had the disease since 2009. (*See e.g.* Tr. 343.) However, the first definitive diagnosis that this Court can find in the present medical records is 2010. Given the difficulty in diagnosing the disease, it is quite possible that the Plaintiff was suffering from it for some time prior to an actual definitive diagnosis.

[3]Doxycycline is a tetracycline derivative (antibiotic) indicated for treatment of the following infections caused by susceptible microorganisms: Rocky Mountain spotted fever, typhus fever and the typhus group, Q fever, rickettsial pox, tick fevers, respiratory tract infections, lymphogranuloma venereum, psittacosis (ornithosis), trachoma, inclusion conjunctivitis, uncomplicated urethral/endocervical/rectal infections (in adults), nongonococcal urethritis, relapsing fever, chancroid, plague, tularemia, cholera, Campylobacter fetus infections, brucellosis (in conjunction with streptomycin), bartonellosis, granuloma inguinale, urinary tract infections (UTIs), skin and skin structure infections, anthrax. Treatment of infections caused by susceptible strains of Escherichia coli, Enterobacter aerogenes, Shigella species, and Acinetobacter species. Side effects include anorexia, nausea and vomiting, hepatotoxicity, maculopapular/erythematosus rash, Stevens-Johnson syndrome, toxic epidermal necrolysis, urticaria, anaphylaxis, pericarditis, hemolytic anemia, thrombocytopenia, neutropenia, eosinophilia. http://www.pdr.net/drug-summary/vimovo?druglabelid=2319&id=3180 (accessed April 7, 2014).

[4]Benicar is an Angiotensin II receptor antagonist indicated for treatment of hypertension. Side effects include dizziness. http://www.pdr.net/drug-summary/benicar?druglabelid=2467&id=1897 (accessed April 7, 2014).

[5]Testim is an androgen indicated for replacement therapy in adult males for conditions associated with a deficiency or absence of endogenous testosterone. Side effects include application site reactions. http://www.pdr.net/drug-summary/testim?druglabelid=1252&id=2027 (accessed April 7, 2014).

[6]Ciprofloxacine is a flouroquinolone indicated for treatment of urinary tract infections (UTIs), acute uncomplicated cystitis in females, chronic bacterial prostatitis, lower respiratory tract infections (LRTIs), acute exacerbations of chronic bronchitis, acute sinusitis, skin and skin structure infections (SSSIs), bone and joint infections, complicated intra-abdominal infections (in combination with metronidazole), infectious diarrhea, typhoid fever, and uncomplicated cervical and urethral gonorrhea in adults. Treatment of complicated UTIs and pyelonephritis in pediatric patients 1-17 yrs of age. To reduce the incidence or progression of postexposure inhalational anthrax in both adult and pediatric patients. Side effects include tendinitis, tendon rupture, nasuea and vomiting, diarrhea, abdominal pain, neurological events, rhinitis, abnormal LFTs, rash, arthropathy. http://www.pdr.net/drug-summary/ciprofloxacin-tablets?druglabelid=3144&id=203 (accessed April 7, 2014.)

AO72A
(Rev. 8/82)

pack.[7] (Tr. 259.) On June 1, 2011, he presented for "feeling poorly(malaise)," with headache, muscle

aches, joint pain, joint stiffness, anxiety, depression, and sleep disturbance. (Tr. 353.) He was prescribed

Amoxicillin[8] for twenty days, Lisinopril,[9] and Vimovo.[10]  A tick-borne disease panel was ordered. (Tr.

356.) On June 14, 2011, the panel returned one positive band for Lyme Disease on the Western Blot test,

an "equivocal" result overall on the Lyme antibody screen,[11] and a positive result for Rocky Mountain

Spotted Fever (RMSF). (Tr. 380-81. ) On June 15, 2011, he was told to stop the Amoxicillin and start what

appears to be[12] a thirty-day course of Doxycycline. (Tr. 207, 380.) On October 7, 2011 he was seen for a

follow-up appointment. (Tr. 345.) Plaintiff presented with diffuse joint pain and fatigue. The lab notation

for that day indicated a positive titer for Lyme Disease and RMSF. (Tr. 346.) He was prescribed Norco[13]

---

[7]Medrol is a an anti-inflammatory glucocorticoid indicated for steroid-responsive disorders. Side effects include fluid and electrolyte disturbances, hypertension, osteoporosis, muscle weakness, Cushingoid state, menstrual irregularities, impaired wound healing, convulsions, ulcerative esophagitis, excessive sweating, increased intracranial pressure, glaucoma, abdominal distention, headache, decreased carbohydrate tolerance. http://www.pdr.net/drug-summary/medrol?druglabelid=1014&id=1658 (accessed April 7, 2014).

[8]Amoxicillin is a semisynthetic ampicillin derivative (antibiotic) indicated for treatment of infections of the ear, nose, throat, and genitourinary tract (GU); skin and skin structure infections (SSSIs); lower respiratory tract infections (LRTIs); and acute, uncomplicated gonorrhea (anogenital and urethral infections) due to susceptible (β-lactamase negative) strains of microorganisms. Side effects include  nausea and vomiting, diarrhea, rash.http://www.pdr.net/drug-summary/vimovo?druglabelid=2319&id=3180 (accessed April 7, 2014).

[9]Lisinopril is an ace inhibitor indicated for treatment of hypertension and as an adjunctive therapy to heart failure. Side effects include dizziness, headache, diarrhea, cough, chest pain, hyperkalemia.http://www.pdr.net/drug-summary/prinivil?druglabelid=376&id=839 (accessed April 7, 2014.)

[10]Vimovo is an NSAID/proton pump inhibitor indicated for relief of signs and symptoms of osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. Side effects include CV thrombotic events, MI, stroke, GI adverse events, flatulence, diarrhea, nausea, abdominal distension, constipation, dyspepsia, upper respiratory tract infection, upper abdominal pain, dizziness, headache. http://www.pdr.net/drug-summary/vimovo?druglabelid=2319&id=3180. (accessed April 4, 2014.)

[11]The result for the Lyme antibody screen indicated a result of 1.08. According to the test information, .91-1.09 is an "equivocal" result. Greater than or equal to 1.10 is positive.

[12]The prescription notation is barely legible, and could indicate 2 pills per day for 30 days or 3 refills. However, the Plaintiff did fill a prescription for 60 pills in June 2011. Therefore, the best interpretation this Court can make it that is was a 30 day course of 2 pills per day.

[13]Norco is an opioid analgesic indicated for relief of moderate to moderately severe pain. Side effects include acute liver failure, lightheadedness, dizziness, sedation, nasuea and vomiting. http://www.pdr.net/drug-summary/norco-5-325?druglabelid=2132&id=1530 (accessed April 7,. 2014).

AO72A
(Rev. 8/82)

for joint pain and a twenty-eight day course of Ceftin[14] for the Lyme Disease and RMSF. (Tr. 346.) His pharmacy record from BRMC Employee RX also shows that prescriptions for Prednisone[15] and Clobetasol[16] were filled during 2010 and/or 2011. (Tr. 207.)

The Plaintiff testified that one of his medications makes him so sick that he "hardly eat[s]" and that the Hydrocodone for pain and the Vimovo for his muscle spasms makes him drowsy. (Tr. 48.) In his pain report he indicated a number of side effects including nausea, dizziness, and that the Doxycycline "magnified all Lyme symptoms." (Tr. 154.) Based on the medical record alone, he was on antibiotics for approximately nine and a half months to ten months of the seventeen month period prior to the hearing. This, in itself, can cause debilitating or even fatal side effects and complications, as referenced in the footnotes below and in the literature on the treatment of Chronic Lyme  or Post-Treatment Lyme Disease Syndrome ("PTLDS"). *See e.g.* U.S. CDC, *Post-Treatment Lyme Disease Syndrome*, http://www.cdc.gov/lyme/postLDS/index.html (accessed April 8, 2014). ("[l]ong-term treatment for Lyme disease has been associated with serious complications. )

The ALJ did not include any medication side effects in the hypothetical to the ALJ. (Tr. 64-67.) Nor were any medication side effects mentioned in the ALJ's *Polaski* analysis. This requires a remand.

---

[14]Cefuroxime is a second-generation cephalosporin (antibiotic) indicated for treatment of lower respiratory tract (including pneumonia), urinary tract (UTI), skin and skin structure (SSSI), septicemia, meningitis, uncomplicated and disseminated gonorrhea, and bone and joint infections caused by susceptible strains of microorganisms, and Lyme disease.  Side effects include local reactions, decreased Hgb and Hct, eosinophilia, ALT/AST elevation. Renal and GI tract issues may arise with use. http://www.pdr.net/drug-summary/zinacef?druglabelid=242&id=529.

[15]Prednisone is a glucocorticoid indicated for steroid-responsive disorders. Side effects include anaphylactoid reactions, hypertension, osteoporosis, muscle weakness, menstrual irregularities, insomnia, impaired wound healing, ulcerative esophagitis, increased sweating, decreased carbohydrate tolerance, glaucoma, weight gain, nausea, malaise, anemia. http://www.pdr.net/drug-summary/prednisone?druglabelid=2575&id=1633 (accessed April 3, 2014).

[16]Clobetasol is a topical corticosteroid indicated for relief of inflammatory and pruritic manifestations of corticosteroid-responsive dermatoses. Side effects include Burning/stinging sensation. (Cre/Gel/Oint) Irritation, itching. (Sol) Scalp pustules, tingling, folliculitis. http://www.pdr.net/drug-summary/clobetasol-propionate-topical-solution?druglabelid=700&id=544 (accessed April 7, 2014).

AO72A
(Rev. 8/82)

Second, the ALJ also apparently misread the Plaintiff's medical records. In his *Polaski* analysis, he notes that the most recent tests on Lyme and RMSF disease were negative. (Tr. 16.) As summarized above, this is blatantly incorrect. Incorrect or imprecise evidence "cannot constitute substantial evidence to support an ALJ's decision." *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994). This misstatement of the Plaintiff's medical records requires a remand.

Third, the ALJ also noted that the Plaintiff failed to seek treatment for eight months after his June 2011 appointment as a reason for discrediting Plaintiff's allegations. (Tr. 16.) However, this criticism does not accurately reflect the definition of Chronic Lyme disease, the clinical pattern of the disease, or the reality of the Plaintiff's treatment record.

The CDC acknowledges that "10% to 20% of patients treated for Lyme disease with a recommended 2-4 week course of antibiotics will have lingering symptoms of fatigue, paint, or joint and muscle aches." CDC, http://www.cdc.gov/lyme/postLDS/index.html (accessed April 8, 2014). There is controversy in the scientific and medical community as to whether this lingering set of symptoms should be called "Chronic Lyme Disease" or "Post-Treatment Lyme Disease Syndrome (PTLDS)."Adriana Marqes, M.D., *Chronic Lyme Disease: An Appraisal*, Infect. Dis Clin North Am. 2008 June, 22(2): 341-360 (available at NIH Public Access www.ncbi.nlm.nih.gov/pmc/articles/PMC2430045/pdf/nihms52285.pdf)(accessed April 8, 2014). The reason for this controversy is that the cause of the persistent symptoms is unknown. The most commonly cited hypotheses for the cause of the persistent symptoms are either persistent infection with *Borelia*, a host of various immune-mediated post-infectious

8

damage mechanisms, or a combination of both.[17] Columbia University Medical Center, Lyme and Tick-Borne Disease Research Center, *Why is Chronic Lyme Disease Chronic?,* http://columbia-lyme.org/patients/ld_chronic.html (accessed April 8, 2014); *see also* U.S. NIH, *Chronic Lyme Disease*, http://www.niaid.nih.gov/topics/lymedisease/understanding/pages/chronic.aspx. (accessed April 8, 2014.) Not surprisingly, the recommended treatment for the persistent clinical symptoms is also hotly debated. Columbia University,http://www.columbia-lyme.org/patients/ld_treatment.html. [18] Further complicating the issue is the fact that ticks can transmit a number of diseases, and patients may test positive for co-infections with multiple organisms. lymedisease.org, *Co-Infection Introduction*, http://www.lymedisease.org/lyme101/coinfections/coinfection.html (accessed April 8, 2014.)  Nor are there currently any reliably sensitive tests for these diseases, and false negatives are common. International Lyme and Associated Diseases Society, *Basic Information About Lyme Disease*, http://www.ilads.org/lyme/about-lyme.php (accessed April, 8 2014.) (The ELISA screening test generally misses about 35% of and the Western Blot usually misses 20%-30%).

What is not debated, however, is the definition of the clinical presentation of Chronic Lyme Disease or PTLDS as "continuing or *relapsing* non-specific symptoms (such as fatigue, musculoskeletal pain, and cognitive complaints) in a patient previously treated for Lyme disease."Marques, www.ncbi.nlm.nih.gov/pmc/articles/PMC2430045/pdf/nihms52285.pdf) (emphasis added).

---

[17]*See also* Embers ME *et. al., Persistence of Borelia burgdorferi in Rhesus Macacques following Antibiotic Treatment of Disseminated Infection,* PLoSA ONE: e29914. doi 10.1371/journal.pone.0029914 (2012) ("Signs or symptoms of putative failure of antibiotic treatment in late disease or ineffectiveness of repeated treatment in patients with PTLDS may be formally attributed to several causes, including: "1) spirochetes that persist in the tissues, likely in small numbers, inaccessible or impervious to antibiotic; 2) inflammatory responses to residual antigens from dead organisms; or 3) autoimmune responses, possibly elicited by antigenic mimicry.")

[18]For a recent layperson's discussion of the Lyme Disease controversy,  see Michael Specter, *The Lyme Wars*, The New Yorker, http://www.newyorker.com/reporting/2013/07/01/130701fa_fact_specter?printable=true&currentPage=all (July 1, 2013) (accessed April 8, 2014).

AO72A
(Rev. 8/82)

In this case, nothing in the record indicates that the Plaintiff failed to seek treatment regularly or failed to follow the advice of his treating physicians.  To the contrary, as discussed above, the Plaintiff was on prescription medications, including antibiotics, painkillers, and corticosteroids for a significant portion of the seventeen month period prior to the hearing. For the eight month period criticized by the ALJ, Plaintiff was taking antibiotics for two of the eight months. He testified that after taking antibiotics for several months, he wanted  "to see if it was dead and it ain't dead." (Tr. 53. ) Plaintiff's wife also testified that the doctor told her that the treatment consisted of being on antibiotics for awhile and then off of them. (Tr. 62.) This treatment approach mirrors that taken in controlled studies to assess treatment efficacy. In each one of these tests a treatment length of one to three months was  followed by testing at three and/or six months.  Columbia Medical Center, *Treatment of Lyme Disease,* http://www.columbia-lyme.org/patients/ld_treatment.html.  Furthermore, simple common sense indicates that a patient who is on antibiotics for a long period of time for a disease that quiets with treatment,  but can then relapse, needs to be off the antibiotics for a significant  period of time to assess whether or not the treatment actually worked. If the ALJ was uncertain as to the proper treatment regimen for Chronic Lyme Disease or PTLDS, he had a duty to confer with an expert or to order a consultative examination with an expert on the disease to fully develop the record. He did not do so. Because the ALJ's criticism that the Plaintiff failed to seek treatment was not grounded in definitional reality, science, or medicine, a remand is necessary.

Fourth, the ALJ noted that "the state medical consultants assigned the claimant no severe physical limitations." (Tr. 16) Neither of these consultants actually completed a Physical RFC evaluation. Nor did they examine the Plaintiff. They were solely non-examining physicians. Thus their opinions do not constitute substantial evidence. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence). This is particularly the case, when, as discussed below, there is no Physical RFC from an examining or treating physician in the record.

10

Fifth, and finally, the ALJ appears to have mischaracterized the record regarding the Plaintiff's yardwork activity in evaluating Plaintiff's activities of daily living. Specifically, the ALJ stated that Plaintiff could "mow the lawn with breaks." (Tr. 14.) A close review of the record indicates that he could mow for short periods but then was debilitated for a day or more afterwards. Specifically, the Plaintiff's wife testified that he mowed "just around our front area in the front yard." (Tr. 58.) It takes him "about thirty minutes to an hour." (Tr. 59.) "He'll try to get himself up and just to go, go outside and ... try to cut the grass. He would succeed, but the next day would be totally, wipe him out." (Tr. 58.) "He'd be in the bed, and he'd say he's sore and he don't feel good and he's just so tired." (Tr. 58.) When queried by his attorney at the hearing as to what happens if he tries to exert himself, the Plaintiff agreed that "If I exert myself one day, I am bedridden for the next day or so." (Tr. 50.) On his function report, Plaintiff indicated that if he did lawn work or washed the car he has to "rest again, even maybe for the next couple of days." (Tr. 158.)

On remand, the ALJ is directed to perform a new credibility analysis once all information from the remand has been received. This credibility evaluation must explicitly discuss each of the *Polaski* factors, and must take into account the discussion of the facts in this opinion. Further, for each factor, the ALJ must explicitly include his reasoning for each factor, complete with accurate record citations to each source of facts used in that analysis.

## B. No Physical RFC From Any Medical Source

The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) Therefore, a claimant's RFC assessment "must be based on medical evidence that addresses the claimant's ability to function in the workplace.""An administrative law judge may not draw upon his own inferences from medical reports."*Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Instead, the ALJ should seek opinions from a claimant's treating physicians or from

11

consultative examiners regarding the claimant's mental and physical RFC. *Id.*; *Strongson v. Barnhart,* 361 F. 3d 1066, 1070 (8th Cir. 2004.)

In this case, the Plaintiff has both alleged and provided strong clinical symptom and laboratory test evidence for two serious diseases : Chronic Lyme Disease and Rocky Mountain Spotted Fever. This level of evidence is rare in that both of these diseases must frequently be diagnosed using clinical symptoms alone, as laboratory tests frequently give false negatives for both. As discussed above, Chronic Lyme Disease is a recurrent and potentially devastating disease that is notoriously difficult to diagnose and treat, and is the subject of considerable controversy in the medical and scientific community.

Rocky Mountain Spotted Fever is a "serious illness that can be fatal." U.S. CDC, *Rocky Mountain Spotted Fever (RMSF): Symptoms, Diagnosis, and Treatment,* http://www.cdc.gov/rmsf/ symptoms/index.html (accessed April 10, 2014.) While about ninety percent of patients have some sort of rash, others "do not develop the rash until late in the disease process, after treatment should have already begun." *Id.* Symptoms vary greatly among patients, however, they include fever, rash, headache, nausea, vomiting, abdominal pain, muscle pain, lack of appetite, and conjunctival injection. The *Rickettsia rickettsii* organism that causes RMSF damages the endothelial cells of the victim's blood vessels. Thus, patients with more severe cases "may be left with permanent long-term health problems such as profound neurological deficits or damage to internal organs." *Id.* Laboratory test are frequently negative for the early stages of the disease, and diagnosis "must be made based on clinical signs and symptoms."*Id.*

Despite the strong clinical and laboratory test evidence of two very serious diseases that have not responded well to treatment, the ALJ failed to obtain a Physical RFC from any medical source. Instead, he chose to rely upon his own inferences from the medical record to assess Plainitff's Overall RFC. This is egregious error, and requires a remand.

On remand, the ALJ is directed to order a consultative examination for the Plaintiff with a medical physician specializing in infectious disease who is knowledgeable about tick-borne diseases and the current

12

research and treatment thereof.  If the Agency does not already have such a specialist on staff or does not regularly consult with one, the ALJ may consult with the physicians at Columbia University Medical Center Lyme and Tick- Borne Diseases Research Center for suggestions or referrals.

As part of the consultative examination process, the infectious disease specialist must complete a formal Physical RFC evaluation. The ALJ is then directed to present the findings of this Physical RFC to the VE, in person or by interrogatory. The VE's testimony must then be used in developing the Overall RFC.

**IV. Conclusion**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 11th day of April 2014.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

13

AO72A
(Rev. 8/82)